UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DARREN WALLACE, KEITH HART, MARK LEEDS, and other employees similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN JOSE,<br><br>Defendant. | Case No. 5:16-cv-04914-HRL<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR DECERTIFICATION**<br><br>Re: Dkt. No. 48 |

Named plaintiffs Darren Wallace, Keith Hart, and Mark Leeds sue the City of San Jose (City), for themselves and on behalf of a conditionally certified collective class of certain firefighter employees, for alleged wage/hour violations under the Fair Labor Standards Act (FLSA or Act), 29 U.S.C. §§ 203, *et seq*. and California Labor Code § 1197. Plaintiffs' claims arise from two types of overtime payments applicable to all class members:

(1) **so-called "contractual" overtime**, which has been described to the court as pay (governed by a Memorandum of Agreement between the City and its firefighter employees) for any hours an employee works beyond his or her regularly scheduled shift hours; and

(2) **FLSA overtime**, which this court is told refers to pay for hours an employee works beyond the maximum allowed by the applicable FLSA threshold.

Plaintiffs essentially allege that in calculating overtime owed under the FLSA, the City takes too big a "credit" against FLSA overtime versus contractual overtime, resulting in the underpayment of FLSA overtime, as well as in wage payments lower than the minimum wage.

The court previously granted plaintiffs' motion for conditional certification. Although the City maintains that this case is not suitable for collective class treatment, it did not strenuously oppose conditional certification, in view of the very lenient standard applied at that stage of the certification proceedings. The only basis for the City's opposition was the temporal scope of the proposed collective class; and, there ended up being no controversy about that because plaintiffs agreed with the City's position on that issue. Accordingly, the conditionally certified FLSA collective class is defined as follows:

> All current and former employees (a) employed as a fire recruit, firefighter, fire engineer, fire captain, fire prevention inspector, arson investigator or battalion chief at any time on or after March 11, 2013 (for willful FLSA violations) or March 11, 2014 (generally) and (b) who have opted-in or will opt-in on or before April 25, 2017.

(Dkt. 46 at 2). There are some 525 opt-ins.

The City now moves to decertify the collective class. As to 8 of the opt-ins, there is no dispute that they do not belong in the class because they retired before March 2013. (Dkt. 48, Mot. Ex. G (Parkman Decl. ¶ 5)).[1] Indeed, plaintiffs agree that the class includes only those employed by the City and who worked some overtime hours on or after March 11, 2013.

Even so, the City maintains that collective class treatment is inappropriate, arguing that plaintiffs have failed to meet their burden of establishing that the class members are "similarly situated" under the FLSA. Plaintiffs oppose the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the court grants the motion.[2]

---

[1] The (retired) employees are identified as Kenneth Alviso, Walter Bugna, Tony Carrillo, Harry Jackson, Richard Nakamura, T.F. Richardson, Michael Simms, and Ray Storms.

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**LEGAL STANDARD**

The FLSA provides employees with a private right of action to sue an employer for violations of the Act "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Certification in such actions proceeds in two stages: "At the first stage, the district court approves conditional certification upon a minimal showing that the members of the proposed class are 'similarly situated'; at the second stage, usually initiated by a motion to decertify, the court engages in a more searching review." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp.2d 1111, 1117 (N.D. Cal. 2011) (citing *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004)).

"The FLSA does not define 'similarly situated,' and the Ninth Circuit has not spoken to the issue." *Id.* (citing *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010)). However, the Supreme Court has "indicated that a proper collective action encourages judicial efficiency by addressing, in a single proceeding, claims of multiple plaintiffs who share 'common issues of law and fact arising from the same alleged [prohibited] activity.'" *Id.* (quoting *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

As discussed above, the first stage of the certification process is lenient and "requir[es] nothing more than substantial allegations that putative class members were together victims of a single decision, policy, or plan." *Id.* (citation omitted).

At the second stage of the process, "courts engage in a more searching review," and plaintiffs bear the burden of providing substantial evidence that they are similarly situated. *Id.* at 1118. "Substantial evidence is 'such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'" *Espinoza v. Cnty. of Fresno*, 290 F.R.D. 494, 501 (E.D. Cal. 2013) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999)).

"In deciding whether plaintiffs have met their stage-two burden, courts weigh various factors that require a fact-specific inquiry." *Beauperthuy*, 772 F. Supp.2d at 1118. "These factors include: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness

and procedural considerations." *Id.* "Courts in this circuit have found that certification is not warranted in the absence of proof that plaintiffs' alleged injuries resulted from a single, unified policy." *Id.* (citing cases). Nevertheless, plaintiffs need only be similarly, not identically, situated in order to proceed collectively. *Id.*

"Ultimately, the decision whether to proceed as a collective or class action turns on whether this device is the superior way of resolving a controversy. The benefits to the parties of a collective proceeding need to be balanced against any prejudice to [the defendant] and any problems of judicial administration that may surface." *Id.* (citation omitted). "The decision whether to decertify a collective action is within the district court's discretion." *Id.*

## DISCUSSION

### A. Factual and employment settings

The first factor courts consider is the degree of similarity among plaintiffs' factual and employment settings. *Beauperthuy*, 772 F. Supp.2d at 1122. "When conducting this inquiry, courts consider such factors as whether plaintiffs had differing job titles or duties, worked in different geographic locations, worked under different supervisors, or allege different types of violative conduct." *Id.* "Decertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors." *Reed*, 266 F.R.D. at 450. "Courts in several circuits, including this one, also evaluate whether plaintiffs have provided substantial evidence that their claims arise out of a single policy, custom or practice that led to FLSA violations." *Beauperthuy*, 772 F. Supp.2d at 1122 (citing *Reed*, 266 F.R.D. at 450).

In the present case, there can be no dispute that plaintiffs have different job titles and duties and work different types of shifts. There are two general groups of employees here: (1) shift employees, who work 212 hours in a 28-day FLSA work period; and (2) administrative employees, who work 86 hours in a 14-day FLSA work period. As previewed above, contractual overtime is incurred if an employee works outside his or her regularly scheduled shift. By contrast, FLSA overtime is incurred when employees work more hours than the relevant threshold---i.e., more than 212 hours in a given pay period (for shift employees) or more than 86 hours in a pay period (for administrative employees).

4

The City argues that the employment settings of the plaintiffs and the opt-ins differ significantly. Defendant points out that the three named plaintiffs are "fire suppression" employees (i.e., shift employees), who themselves might work a different number of shifts in a 28-day pay period, whereas the class presumably includes at least some administrative employees who generally work 40-hour weeks in 14-day work periods. (Dkt. 48, Mot. Ex. A (Wallace Depo. at 11:13-21); Dkt. 49-3 Wallace Decl. ¶ 11 at 2:27-3:3).[3] Additionally, defendant points out that plaintiffs have job titles ranging from fire fighter to fire captain, whereas the opt-ins include employees with a range of jobs and titles, such as fire recruit, fire fighter, fire engineer, fire prevention inspector, arson investigator, fire captain, and battalion chief. (Dkt. 39, Notice of Mot. for Conditional Certification at 1).

Plaintiffs do not dispute these differences, but contend that everyone is similarly situated in what they claim are other, more relevant respects. Here, plaintiffs say that everyone is basically a "firefighter employee" who works within the City; reports to the same fire chief and is subject to the same rules, regulations, and operating procedures; is compensated according to the same pay scales; and is subject to being called back to work overtime hours and may also incur FLSA overtime. (Dkt. 49-3, Wallace Decl. ¶ 5; Dkt. 49-2, Kaldor Decl. ¶ 8).

Especially important, in plaintiffs' view, is that everyone is subject to the same "method" of calculating FLSA overtime.[4] Here, plaintiffs present the deposition testimony of Derek Hansel, the City's Assistant Director of Finance. In sum, Hansel testified that the City uses what he referred to as a "dual calculation" method in which it calculates an employee's contractual overtime, then calculates FLSA overtime, and compares the calculations. If the FLSA overtime is higher than the contractual overtime, Hansel says that the employee's pay is increased by the difference. (Dkt. 49-1, Hansel Depo.).

---

[3] The court will address defendant's evidentiary objections in a separate document, filed concurrently with this order.

[4] At oral argument, the City agreed that it uses the same "method" for calculating FLSA overtime, in the sense that payments are processed through a central payroll system. But, defendant contends that it does not perform its calculations at all in the way plaintiffs claim. Plaintiffs dispute that latter assertion. Resolution of that particular dispute is unnecessary with respect to the present motion.

Plaintiffs argue that any differences are outweighed by these commonalities. They further contend that any variations in shift assignments are already accounted for in the City's payroll system and are, at bottom, simply a matter of calculating individual damages---which is not a basis for decertification. *See generally Leyva v. Medline Indus., Inc.*, 716 F.3d 501, 514 (9th Cir. 2013) (stating that the issue of individualized damages does not defeat class treatment); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (same).

The City objects to portions of plaintiffs' declarations submitted in opposition to the present motion. But, says defendant, even if plaintiffs submitted admissible evidence as to common classifications and shifts, their collective action would still fail because they have not shown that any of the class members were ever underpaid because of the reasons alleged in their complaint. The court agrees.

In examining this factor of the certification analysis, the court must look beyond blanket employee classifications and pay provisions. *See generally Sargent v. HG Staffing, LLC*, 171 F. Supp.3d 1063, 1080 (D. Nev. 2016) (stating that "the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions.") (citation omitted); *Beauperthuy*, 772 F. Supp.2d at 1131 (stating that inquiries into each class member's job duties are required, despite the employer's blanket classification of employees as exempt); *Reed*, 266 F.R.D. at 450 (concluding that having the same employer and engaging in similar law enforcement activities were "generalized commonalities" that did not make plaintiffs similarly situated within the meaning of the FLSA).

To proceed as a collective action, plaintiffs must present substantial evidence of a common City policy, plan, or scheme of shortchanging its firefighter employees on overtime pay. *Reed*, 266 F.R.D. at 458; *Beauperthuy*, 772 F. Supp.2d at 1123. "An allegation of an overarching policy is generally insufficient; plaintiffs must produce substantial evidence of a single decision, policy, or plan." *Beauperthuy*, 772 F. Supp.2d at 1123 (quoting *Reed*, 266 F.R.D. at 458). Moreover, "plaintiffs must demonstrate that the 'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp.2d 456, 463 (S.D.N.Y. 2011). That is, plaintiffs must demonstrate "that these

6

violations can be generalized across the opt-in Plaintiffs in this case such that collective treatment would further procedural and fairness considerations." *Sargent*, 171 F. Supp.3d at 1080.

Here, plaintiffs contend that the City's method of calculating overtime is incorrect, and they point out that the City's method indisputably applies across the board to everyone. But, the record demonstrates that whether any employee might have been underpaid in the manner alleged by plaintiffs depends on the vagaries of their particular work schedules, which differs across the class. Plaintiffs acknowledge that the City's payment method only sometimes affects an employee. Indeed, lead plaintiff Wallace testified that the issue arises in a "very specific situation where somebody works regular hours below the [FLSA] threshold and then works a significant amount of overtime in the same FLSA cycle." (Mot., Ex. A (Wallace Depo. at 27:10-13)).

Plaintiffs have presented no evidence that any of the 500-plus opt-ins ever worked the "very specific situation" identified by Wallace or that any opt-in was underpaid because the City (allegedly) applied an improper credit in calculating overtime pay. Indeed, there is no evidence that anyone other than the three named plaintiffs suffered because of the way in which the City's calculation method is deployed. Here, the City points out that:

- Lead plaintiff Darren Wallace apparently used a formula from a prior settlement over the same issue to determine that he and several others were underpaid. (Mot., Ex. A (Wallace Depo. at 13:9-19; 25:13-26:1)).

- Lead plaintiff Mark Leeds testified that Wallace told him that he (Leeds) was underpaid based on Wallace's formula. Leeds was not independently aware of any work period in which the City underpaid him. (Mot., Ex. B (Leeds Depo. 12:1-4, 23:2-24:25)).

- Lead plaintiff Keith Hart testified that, according to Wallace, Hart was underpaid one or two times. Hart was not familiar with Wallace's formula and did not know independently of any work period in which the City underpaid him. (Mot., Ex. D (Hart Depo. at 11:2-21;16:14-20)).

- Opt-in Shad Hall testified that (1) he believes he was underpaid in 2012 (i.e., *before* the temporal scope of the collective class) based on what Wallace told him, but (2) the City later paid Hall what he thought he was owed. (Mot., Ex. E (Hall Depo. 7:16-24, 8:25-9:2)).

- Opt-in Sean Kaldor has not examined his pay records to determine if he is owed overtime and did not identify any pay period in which he claims the City did not properly pay him for overtime, albeit he speculated that he "probably would be affected to some degree." (Mot., Ex. F (Kaldor Depo. 10:2-23)).

Plaintiffs maintain that the key commonality is that the City's calculation method is used for everyone's pay and that any differences in job duties, titles, and shifts are material only to individual damages. This court is unpersuaded and finds two above-cited cases instructive: *Espinoza v. Cnty. of Fresno*, 290 F.R.D. 494 (E.D. Cal. 2013) and *Zivali v. AT&T Mobility, LLC*, 784 F. Supp.2d 456 (S.D.N.Y. 2011).

In *Espinoza*, sheriff's deputies pursued a collective action against their county employer, claiming that they should have been paid overtime for time spent maintaining uniforms, safety equipment, and firearms, as well as for time spent qualifying their duty weapons. All deputies were required to perform these activities. Nevertheless, the court concluded that the deputies failed to show that they were "similarly situated" because the evidence demonstrated that whether any deputy incurred overtime performing these tasks depended on highly individualized factors (deputies' personal work habits and preferences) and therefore, the matter was too disparate to proceed as a collective action. Notably, some members of the class incurred no overtime and thus "suffer[ed] no damages at all." 290 F.R.D. at 506. Thus, while the court agreed that a variation in the amount of overtime worked sometimes reflects only a difference in individual damages, it found that the lack of any injury as to some deputies was not merely a damages issue, but was "symptomatic" of the differences between class members. *Id.* at 503-04, 506.

In *Zivali*, store managers and retail sales workers claimed that the defendant's computerized timekeeping system systematically failed to account for all hours they worked; and, they argued that the defendant fostered a culture in which employees were expected to perform certain tasks "off the clock." The court rejected that argument because plaintiffs failed to show that the "practices" and "culture" of which they complained were sufficiently uniform and pervasive "such that it would be possible to generalize across the 4,100 opt-in plaintiffs in this case." 784 F. Supp.2d at 459. Instead, the evidence demonstrated that whether any opt-ins were required to work "off the clock" depended upon "highly individualized situations" and a wide

range of practices employed in the plaintiffs' varied work settings. *Id.* at 464.

Plaintiffs argue that they are not as diverse as those in the cited cases. Yet, by plaintiffs' own account, the alleged underpayment occurs only in the "very specific situation where somebody works regular hours below the [FLSA] threshold and then works a significant amount of overtime in the same FLSA cycle." (Mot., Ex. A (Wallace Depo. at 27:10-13)). Thus, whether any opt-in in this case was affected at all by the City's (allegedly) improper calculation method appears to depend upon the highly individualized details of a given employee's work schedule in any given pay period. There is nothing to indicate that the alleged harm occurs with any regularity or predictability, such that the alleged wrong of which plaintiffs complain can be generalized across the class. Despite plaintiffs' assertions that all opt-ins work for the City's Fire Department, report to the Fire Chief, have their salaries set by the same schedule, and have the same kind of job duties for each rank (Opp. at 6:11-14; Kaldor Decl. ¶¶ 4-6), notably absent is any mention of the actual overtime the opt-ins work. As discussed, plaintiffs have failed to identify a single opt-in who worked the "very specific situation" identified by Wallace, and they readily acknowledge that some class members might never have been underpaid. Plaintiffs correctly note that individual damages issues are not a basis for decertification. But here, as in *Espinoza*, this court finds that the issue is not simply a matter of damages, but an issue as to whether any opt-ins have been damaged at all. Courts are reluctant to certify overbroad classes containing both injured and uninjured parties. *Beauperthuy*, 772 F. Supp.2d at 1125 (citing *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 268 F.R.D. 604, 612 (N.D. Cal. 2010)).

Plaintiffs contend that it would be a labor-intensive task (perhaps over 175 hours of work) for them to figure out who among the opt-ins might actually have been affected by the City's calculation method. (Dkt. 49-1, Koenig Decl. ¶¶ 3-4). In their view, class treatment is appropriate because they say it would be simpler and more efficient for the City to use its payroll system to determine which of the opt-ins, if any, may have been underpaid because of the alleged improper "credit" issue. However, courts have found class treatment inappropriate where, as here, liability cannot be proven on a classwide basis. *See Sargent*, 171 F. Supp.3d at 1081 ("Thus, this case differs from those where liability can be proven on a classwide basis, and the only material

9

difference among plaintiffs is the amount of damages owed to each of them, which is generally considered insufficient to deny class treatment. Indeed, individualized inquiries would also have to be conducted to determine whether any of the class members worked off-the-clock during any given week, and if so, how many hours were worked."); *Reed*, 266 F.R.D. at 463 ("It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability.") (citation omitted).

### B. Defenses available to defendant

"The second factor courts consider on decertification is whether the defendant asserts defenses that would require individualized proof." *Beauperthuy*, 772 F. Supp.2d at 1125-26. The City does not specifically move on this ground, which may suggest that this factor favors maintaining this case as a collective action. And, as discussed more fully below, plaintiffs contend that this case presents only a single legal issue as to the propriety of the City's calculation method. But insofar as plaintiffs contend that there are no differences between them and the opt-ins that would require the City to make hundreds of individual assessments on the issue of liability, for the reasons discussed above (and below), this court remains unconvinced.

### C. Fairness and procedural considerations

"'In evaluating fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.'" *Beauperthuy*, 772 F. Supp.2d at 1127 (quoting *Reed*, 266 F.R.D. at 458). Additionally, the court "must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Id.* (quoting *Reed*, 266 F.R.D. at 458). "In other words, 'the court must balance the benefits of a reduction in the cost to individual plaintiffs and any increased judicial utility that may result from the resolution of many claims in one proceeding with the cost of any potential detriment to the defendant and the potential for judicial inefficiency that could stem from collective treatment." *Id.* (quoting *Wilks v. Pep Boys*, 2006 WL 2821700 at *8 (M.D. Tenn., Sept. 26, 2006)).

The City argues that allowing this case to proceed as a collective action would be unfair

because plaintiffs do not allege, let alone provide substantial evidence, that all opt-ins worked shifts involving the "very specific situation" that Wallace testified gives rise to the overtime "credit" issue. Plaintiffs argue that this lawsuit is about a single legal issue: whether the City's "dual method" for calculating and paying overtime is legally permissible. The only other issue, they say, is the amount of backpay they and class members are owed---and even then, they say that issue will only come up if the City's method is found improper. They contend that requiring the opt-ins to file over 500 individual lawsuits to resolve that one legal issue would be highly inefficient, particularly when they anticipate that the damages for most plaintiffs will be no more than a few hundred dollars.

Certainly, class treatment offers plaintiffs the advantage of pooled resources and lowered individual costs to vindicate individual rights. And, courts have recognized that "[d]ecertification can be a hardship for Plaintiffs and for the Court, 'placing each opt-in plaintiff back at square one, without the benefit of pooled resources, and presenting the Court with [a large number of] separate lawsuits to resolve the same question.'" *Espinoza*, 290 F.R.D. at 507 (citation omitted).

But, as discussed above, plaintiffs have presented no consistent evidence as to a uniform policy that would result in systematic FLSA violations across the class. Resolution of liability and damages issues would essentially require individualized inquiries as to each opt-in to determine whether they worked the "very specific situation" identified by Wallace and whether any have actually been injured in the way plaintiffs claim. Each plaintiff's case would require consideration of different background facts based on each employee's work activities in any given pay period. Thus, representative testimony would not accurately capture the situation of each individual plaintiff. In view of plaintiffs' and the collective members' varied job duties, shifts, and employment settings, as well as the lack of any evidence that any of the opt-ins actually were underpaid per plaintiffs' theory, this court concludes that the fair way to proceed is through decertification.

## ORDER

Based on the foregoing, defendant's motion for decertification is GRANTED. Except for the named plaintiffs, all other plaintiffs' claims are severed from this action and dismissed without

11

1 prejudice to each plaintiff filing a separate action for his or her claim. As for any plaintiffs who
2 may be adversely affected by a statute of limitations issue, the court tolls the limitations period for
3 90 days from the date of this order.
4     SO ORDERED.
5 Dated: December 5, 2017

HOWARD R. LLOYD
United States Magistrate Judge